**SOUTHERN PACIFIC COMPANY**

v.

**ALAMO CHEMICAL TRANSPORTA-TION COMPANY and the TUG MOLLY SMITH, her engines, boilers, tackle, etc.**

**Civ. A. No. 68–120.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

June 25, 1969.

James G. Burke, Jr., Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., for plaintiff.

John Poitevent, Edward J. Brandao, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., James E. Ross, Blades, Crain, Slator, Winters & Ross, Houston, Tex., for defendant.

WEST, Chief Judge:

Plaintiff, Southern Pacific Company, brings this suit seeking recovery for damages allegedly sustained by it when the defendant's tug, the MOLLY SMITH, with her two barges in tow, the ALAMO 3000 and the ALAMO 3001, struck the fender system protecting its Berwick Bay Drawbridge on the morning of June 15, 1968. Defendant denies that the MOLLY SMITH or her tow struck the fenders involved, and denies that it in any way caused the damage complained of. At the trial of this case, counsel for both sides stipulated that there were no legal issues involved. It was stipulated that the only issue involved was the factual issue of whether or not the defendant's tug or her tow struck the bridge or fender system and caused the damage complained of. It was agreed that if this issue was answered in the affirmative, then the defendant is liable for the damages resulting from the collision. After hearing the evidence in this case, it is the opinion of this Court that the defendant's tug, the MOLLY SMITH, and her tow, did, in fact, cause the damage complained of by plaintiff.

As is usual in these cases, there is a direct conflict in the testimony of opposing witnesses, but after seeing and hearing the witnesses who testified, this Court believes that the plaintiff has proved, by a preponderance of the evidence and the reasonable inferences to be drawn therefrom, that the damage complained of was caused by the MOLLY SMITH and her tow.

On the morning of June 15, 1968, at about 3:15 o'clock a. m., the MOLLY SMITH and her tow were down bound in the Atchafalaya River in the vicinity of plaintiff's Berwick Bay Drawbridge located in the lower reaches of the Atchafalaya River between Morgan City, Louisiana, on the east, and Berwick, Louisiana, on the west. The bridge, which runs east and west, is of the open deck type with a concrete causeway on the east and five (5) fixed steel pen-connected truss spans, each 232 feet in length, with a steel drawspan of 267 feet

11½ inches in length, located on the west side of the river. This drawspan provides two navigational openings. When the draw is open, the west channel provides a maximum clearance of 109 feet, and the east channel provides a maximum navigational clearance of 112 feet. When the draw is closed, the east end of the drawspan is supported by what is known as the east rest pier. Normally a complete fender system protects the bridge and the swing span at the two navigational openings on both the upstream and downstream ends. Prior to this accident, this fender system had been damaged. But also prior to this accident, that portion of the fender system protecting the downstream end of the center pivot pier had been rebuilt and replaced. The portion of the fender system protecting the upstream end of the east rest pier had previously been totally destroyed and removed and had not been replaced at the time of the accident here involved. Notice of the damaged condition of this fender system had been promulgated by the United States Army Corps of Engineers and mariners were warned to exercise extreme caution in proceeding through this bridge.

The MOLLY SMITH is a towboat 119 feet long with a breadth of 38 feet. She is powered by two 1800 horsepower diesel engines. On the night in question her tow consisted of two steel barges, the ALAMO 3000, which is 380 feet long and 53 feet wide, and the ALAMO 3001, which is 370 feet long and 53 feet wide. These barges are specially designed to carry liquid propane gas under pressure and have three cylindrical tanks running lengthwise on each barge. The top of the tanks project about eight feet above the deck of the barge, and in a light condition, as was here the case, the top of the tanks are about fifteen feet above the water. At the time here involved, the two barges were made up rigidly ahead of the MOLLY SMITH, and the tug and her tow, thus made up, were proceeding downstream. The current was running at about five knots. Pilot-

ing the MOLLY SMITH was Burnis Sylvester Huddleston, who was alone in the wheelhouse. The remainder of the crew were below with the exception of the Master, Emmett H. Daniel, who was off watch, but standing on the port side of the second deck. He testified that because of the fact that he knew the passage through this bridge was dangerous, and because he was afraid the tow might break up due to the strong current, he had gotten up to advise his wife, who was a cook aboard the MOLLY SMITH, to put on a life jacket. There was no lookout on duty before or at the time of this accident.

As the MOLLY SMITH and her tow came through the highway bridge, which is located some distance north of the Berwick Bay Drawbridge, the pilot lined up with the center pier of the bridge, knowing that the current would set him to port, or into the east navigational channel. With the current, the MOLLY SMITH and her tow were making about 14 knots. As the tug and her tow entered the east channel, it was set by the current to port more than anticipated. After the head of the tow was about 25 feet into the channel, the pilot realized that the current would cause him to strike the east rest pier. He concluded that he would just scrape the concrete pier and then straighten out and be able to go on through the channel. But as he hit the east rest pier with the port side of the forward barge, the starboard coupling, consisting of ten parts of a one-inch wire between the two barges, parted, after which the port coupling also parted, causing the lead barge to break loose. The MOLLY SMITH and her remaining barge then straightened out and proceeded through the channel, but not before one of her barges collided with the downstream fender system on the west side of the east channel. Both Mr. Daniel and Mr. Huddleston admit that after the tow struck the east rest pier, the barges "bounced" to starboard, or to the west, but both insist that neither the tug nor her barges went far enough to starboard to come into contact

with the downstream fender system protecting the center pivot pier. This Court concludes that they are mistaken. First of all, neither Mr. Daniel nor Mr. Huddleston were in a position to see whether or not the barges struck the fender system. The tow was 750 feet long and the tug was 119 feet long, giving an overall length of the tug and tow of 869 feet. Considering the length of the tow and the height of the barges, it was virtually impossible for either Mr. Daniel or Mr. Huddleston, from their vantage point on the tug at the rear of the tow, to actually see, in the darkness at 3:15 o'clock a. m., whether or not either of the barges ahead of the tug struck the fender system. In contrast to this, Mr. Ruston Felix Weekly was the bridgetender on duty at the time. He was actually in the control house on the bridge. He saw the tug and tow coming and realized that it was going to strike the east rest pier. It was his opinion that as the tug and tow approached the east channel it was improperly lined up, and that a collision with the east rest pier was imminent. He was also fearful that it would strike the swing span of the bridge and the fender system, so he hurriedly released the foot brake which locks the bridge in position and placed his hand on the control lever in order to rotate the swing span away from the tow. But he apparently worked the control lever too fast, causing a relay to throw, and before he could re-engage the lever, the span, according to his testimony, was struck by one of the barges. It was his testimony that the swing span was moved about 10 or 12 feet when it was hit, but that no damage was done to it. After hitting the swing span, the barge collided with the fender system, doing the damage complained of. It is impossible to determine from the testimony whether the fender system was struck by the lead barge which had broken loose, or by the barge which remained coupled to the MOLLY SMITH, but be that as it may, this Court is convinced from the testimony in this case and the reasonable inferences to be drawn therefrom, that one of the two barges did, in fact, strike the fender system, doing the damage complained of. The bridge log shows that the MOLLY SMITH came through at 3:15 o'clock a. m. on June 15, 1968. Mr. Weekly made out an accident report immediately following the collision. At the time of the collision, the United States Coast Guard Cutter POINT LOOKOUT was on the Morgan City side of the river between the Berwick Bay Bridge and the highway bridge. The radio operator on watch contacted the bridgetender, Mr. Weekly, and asked "Did he get you?" Mr. Weekly replied "He sure did." The Coastguardsman asked "How much damage?", and Weekly replied "I don't know."

Mr. Pool, the bridge supervisor for plaintiff, had inspected this bridge on June 14, 1968, the day before this accident, and found the fender system here involved to be in perfect condition. Between 3:00 a. m. and 4:00 a. m. on June 15, 1968, he was contacted in Lafayette, Louisiana, and asked to come and inspect damage to the fender system. He inspected it at 5:00 a. m. on June 15, 1968, and found the damage complained of. Defendant points to the fact that the traffic through this bridge is extremely heavy and that the damage could have been caused by any one of the 125 other passages made through this bridge on June 14, 1968, or more particularly, by any one of the 13 other vessels which passed through between midnight on June 14 and 3:15 a. m. on June 15, 1968. But while there is no evidence at all to support this possibility, there is, in the opinion of this Court, overwhelming evidence to support plaintiff's contention that it was the MOLLY SMITH and her tow which actually caused the damage to plaintiff's bridge which is the subject of this suit. And it is further the finding of this Court that the collision of the tow with the fender system of the bridge was the direct result of the negligence of the master and/or pilot of the MOLLY SMITH in failing to use the degree of caution re-

 

quired of a captain and navigator while attempting to navigate his tug and tow through the treacherous currents which he knew to be present in the area of the channel through which he was passing. Counsel for both sides have stipulated that there are no issues of law here involved. The only question presented to this Court is whether or not, as a matter of fact, the damage to the bridge was caused by the MOLLY SMITH and/or her tow. This Court finds, as a matter of fact, that the damage complained of was indeed caused by the MOLLY SMITH and/or her tow colliding with the bridge and its fender system, and that such collision was caused entirely by the negligence of the master and/or the pilot of the MOLLY SMITH. Counsel for plaintiff is directed to present to the Court a judgment for entry herein, reflecting the amount of damages for which defendant shall be held liable in accordance with what this Court understands to be a prior agreement between the parties.